CARROLL, J.A.D.
*324 *513 These consolidated appeals involve a challenge to decisions by two state agencies to finance a comprehensive renovation of the State Capitol complex. The agencies resolved to issue $300 million in bonds and to repay the bonds with rental payments pursuant to a lease of the State Capitol complex.
Plaintiff John S. Wisniewski, then a state legislator, filed a complaint challenging the agencies' actions on the basis that they violated the Debt Limitation Clause (DLC) of the New Jersey Constitution. At the time the complaint was filed, the bonds had already been sold and distributed into the marketplace. Consequently, the trial court dismissed the complaint as moot.
In No. A-4689-16, plaintiff appeals the court's determination that his complaint is moot. In Nos. A-4693-16 and A-4698-16, he appeals the final agency decisions. We agree the appeals are *514 technically moot. Notwithstanding, we address the merits because the issue raised is a matter of significant public importance that is capable of repetition while evading review. Having considered the parties' arguments in light of the record and applicable legal standards, we affirm the final agency decisions.
I.
The State House Complex (SHC) is composed of an annex plus two wings, the executive (ESH) and the legislative (LSH). ESH houses the offices of the governor, lieutenant governor, governor's counsel, state treasurer and executive staff members. Built in 1772, ESH is a four-story building that includes the most historic and oldest sections of the SHC. It contains historical and architectural pieces such as original wood wainscoting and plaster cornices, portraits, art work and historic objects, and is open to viewing by the public. ESH has not been comprehensively renovated since the 1950s, and it has significant structural problems.
N.J.S.A. 52:31-39(a) provides that the State Capitol Joint Management Commission (JMC) must:
(1) maintain, monitor and preserve the architectural, historical, cultural and artistic integrity of any completed project for the restoration, preservation and improvement of the State capitol complex and to safeguard any related artifacts, documents and objects;
(2) maintain custody of the State capitol complex, with exclusive jurisdiction with respect to its management and operation, including maintenance, repair, *325 renovation, improvement, security, parking, furnishing, artifact displays, and space utilization; ....
Pursuant to N.J.S.A. 52:31-37, the JMC consists of eight members, four from the executive branch and four from the legislative branch.
On April 24, 2012, the JMC approved a $38 million exterior repair of ESH. The repairs were referred to as the "exterior envelope restoration." The State Division of Property Management and Construction (DPMC) made a request for proposals (RFP) for an architectural engineering firm and selected Nelson and Preservation Design Partnership, LLC (Nelson/PDP) to begin *515 work on the envelope in 2013. The envelope repairs were not completed, however, because it became clear that "patchwork" repairs were not sufficient and a more comprehensive renovation was necessary. As of 2015, the repairs that were necessary in 2012 and 2013 had still not been completed.
On January 12, 2017, then-State Treasurer, Ford M. Scudder, reported to the Senate Economic Growth Committee about the need for a comprehensive restoration of ESH that included both exterior and interior repairs. On January 25, 2017, Nelson/PDP submitted a project overview noting the severe deterioration of ESH and proposing a comprehensive renovation. Nelson/PDP's plan proposed to address life safety issues, eliminate waste, and protect and restore the historic integrity of ESH.
On January 31, 2017, the JMC adopted a resolution authorizing a full renovation of the SHC. On April 25, 2017, Nelson/PDP submitted an extensive report detailing the deterioration, the necessary repairs, and the costs of the project. That same day, the JMC adopted a resolution to fully renovate the SHC at a price not to exceed $300 million, and also agreed to enter into a contract with the New Jersey Economic Development Authority (NJEDA) for the lease and leaseback of the SHC. The JMC authorized the State Treasurer to execute the lease and sublease agreements.
The cost of the renovation was $284 million, which included a historic renovation of ESH ($173 million) and modernizing and upgrading the building infrastructure of LSH ($20 million). The project also included $55 million for "contingencies."
Christopher Chianese was a member of the JMC and the Director of the DPMC, which oversees leasing, construction management and construction procurement on behalf of the State. According to Chianese, ESH had not been renovated after the 1950s and, by 2017, had deteriorated significantly. Exterior issues included roofing, inferior structural support, deteriorated windows, chimneys, skylights, foundational problems, HVAC problems, deteriorating cornices that permitted water infiltration, fire hazards, asbestos, and security concerns. Some of these problems *516 required emergency repairs. After the JMC approved the renovation, the NJEDA was required to approve the project's financing.
The lease agreement provided that the JMC would lease ESH to the NJEDA for a term of thirty years for $1.00. The sublease agreement called for the JMC to sublease ESH back from the NJEDA. Debt service on the bonds sold by the NJEDA would be payable from the rent paid by the JMC pursuant to the sublease.
During the events in question, John J. Rosenfeld served as Director of the Bonds and Incentives Department for the NJEDA. Rosenfeld submitted a certification stating it is common practice to issue bonds secured by a lease agreement pursuant to which the State pays rent. In her capacity as Senior Vice president for Governance, *326 Communications, and Strategic Initiatives at the NJEDA, Maureen Hassett described the process used in approving the bond resolution and the lease agreement.
On May 11, 2017, the NJEDA approved the State lease revenue bond resolution to fund the renovation (the bond resolution). The bond resolution authorized the sale of two sets of bonds: (1) State lease revenue refunding bonds 2017 Series A (the Series A bonds) and (2) State lease revenue bonds, 2017 Series B (the Series B bonds) (collectively, the bonds). The following statement appears on the face of the bonds:
Neither the State of New Jersey nor the JMC is obligated to pay and neither the faith and credit nor taxing power of the State of New Jersey is pledged to the payment of, the principal or redemption price, if any, of or interest on the bonds. The bonds are a special, limited obligation of the [NJEDA], payable solely out of the revenues or other receipts, funds or moneys of the [NJEDA]....
The Series A bonds, in the amount of $42.775 million, financed the cost of defeasing or redeeming outstanding bonds that financed previous projects at the SHC. The Series B bonds, in the amount of $300 million, financed the new renovation.
Also on May 11, 2017, the NJEDA entered into a bond purchase contract with RBC Capital Markets, LLC (the underwriter) for the purchase of the bonds. The underwriter had been selected by an RFP. On May 12, 2017, the underwriter sold the bonds to RBC
*517 Municipal Products who, in turn, sold the bonds to a trust. The trust then sold the bonds to individual investors. The same day, legislative counsel authored an opinion letter that the bond sale did not violate the New Jersey Constitution.
Plaintiff promptly filed a verified complaint and order to show cause on May 12, 2017, seeking injunctive relief and a declaratory judgment that the agencies' resolutions to sell the bonds and sign the leases were invalid. Plaintiff named as defendants the NJEDA, the JMC, the Governor, the Department of the Treasury and the Treasurer.
At a status conference on May 17, 2017, plaintiff first discovered the bonds had already been issued. On May 26, 2017, defendants filed a motion to dismiss on the basis that the action was moot because the bonds had already been sold. Defendants also contended the trial court lacked jurisdiction over challenges to final agency decisions. Plaintiff opposed the motion and moved to amend his complaint. On June 14, 2017, the trial court denied plaintiff's motion to amend his complaint and granted defendants' motion to dismiss, finding the action was moot because the bonds had already been sold.
In the interim, it was determined that the extensive renovations could not be completed while the building was occupied. Consequently, all ESH employees were evacuated as of June 1, 2017. Any delay in completing the project was estimated to result in a cost to New Jersey taxpayers of approximately $8-$10 million per year because the deterioration would become more difficult to repair.
II.
In these consolidated appeals, plaintiff challenges: (1) the trial court's June 14, 2017 order granting defendants' motion to dismiss and denying plaintiff's motion to amend the complaint; (2) the April 25, 2017 JMC resolution approving the $300 million plan to renovate the SHC; and (3) the May 11, 2017 NJEDA bond resolution to finance the renovation.
*518 Plaintiff contends the trial court erred in finding his complaint was moot.
*327 Alternatively, plaintiff argues that even if the case is moot, the court should still have adjudicated it as a matter of substantial importance that is likely to reoccur and capable of evading review in the future. Further, plaintiff asserts the decisions of the two state agencies violate the DLC, and urges us to invalidate the final agency decisions on that basis.
Defendants counter that the appeals should be dismissed as moot because no practical remedy exists after the bonds have been sold and the renovations have commenced. They dispute plaintiff's assertion that the matter is one of substantial importance that is likely to reoccur. They further contend the JMC was well within its delegated power when it approved the SHC renovations and secured the required funding, and the NJEDA similarly acted within its statutory authority in issuing the bonds for the renovation project.
A.
We first address the issue of mootness. An issue is considered "moot when our decision ... can have no practical effect on the existing controversy." Redd v. Bowman, 223 N.J. 87, 104, 121 A.3d 341 (2015) (citation omitted); Greenfield v. N.J. Dep't of Corr., 382 N.J. Super. 254, 258, 888 A.2d 507 (App. Div. 2006). "When a party's rights lack concreteness from the outset or lose it by reason of developments subsequent to the filing of suit, the perceived need to test the validity of the underlying claim of right in anticipation of future situations is, by itself, no reason to continue the process." State v. Davila, 443 N.J. Super. 577, 584, 129 A.3d 1099 (App. Div. 2016) (quoting JUA Funding Corp. v. CNA Ins./Cont'l Cas. Co., 322 N.J. Super. 282, 288, 730 A.2d 907 (App. Div. 1999) ). "[C]ourts of this state do not resolve issues that have become moot due to the passage of time or intervening events." Ibid. (alteration in original) (quoting City of Camden v. Whitman, 325 N.J. Super. 236, 243, 738 A.2d 969 (App. Div. 1999) ).
*519 In limited instances, courts will address the merits of appeals that have become moot, electing to do so "where the underlying issue is one of substantial importance, likely to reoccur but capable of evading review." Zirger v. Gen. Accident Ins. Co., 144 N.J. 327, 330, 676 A.2d 1065 (1996) ; see also Betancourt v. Trinitas Hosp., 415 N.J. Super. 301, 311, 1 A.3d 823 (App. Div. 2010). We may decline to dismiss a matter on mootness grounds in order to address an important matter of public interest. Reilly v. AAA Mid-Atl. Ins. Co. of N.J., 194 N.J. 474, 484, 946 A.2d 564 (2008). Before continued jurisdiction will be invoked in moot cases there must be an "issue of great public importance compelling definitive resolution despite mootness[.]" Oxfeld v. N.J. State Bd. of Educ., 68 N.J. 301, 303, 344 A.2d 769 (1975).
In the present case, relying on Spadoro v. Whitman, 150 N.J. 2, 695 A.2d 654 (1997) (Handler, J., concurring in part, dissenting in part), the trial court found plaintiff's complaint was moot. The court reasoned that the bonds were already disseminated into the financial market, the sale of the bonds did not create any constitutional problems, and judicial relief was not appropriate.
In Spadoro, the plaintiff challenged the Bond Financing Act of 1997 (the Bond Act), which authorized the sale of bonds worth $2.7 billion to pay for state pension obligations. Ibid. The Court determined the matter was moot because the bonds had already been sold. Id. at 13, 695 A.2d 654.
Although Justice Handler concurred with the majority that the case was moot, *328 he nevertheless authored a dissenting opinion arguing that the matter "should be adjudicated because of the importance of the underlying issue and the possibility of its recurrence." Id. at 3, 695 A.2d 654. He elaborated:
I concur in the Court's conclusion that events surrounding the issuance of the bonds have rendered the case essentially moot. "[F]or reasons of judicial economy and restraint, courts will not decide cases in which the issue is hypothetical, a judgment cannot grant effective relief, or the parties do not have concrete adversity of interest." Anderson v. Sills, 143 N.J. Super. 432, 437, 363 A.2d 381 (Ch. Div. 1976). This appeal is not moot in the more traditional sense in that there is no case or controversy to adjudicate, but it is effectively or practically moot in the sense that it would be inappropriate for the Court to provide effective relief at this *520 time. Whether based on the doctrine of mootness or laches, courts are reluctant to act when circumstances have changed such that the provision of judicial relief would be inequitable or otherwise inappropriate.
[ Id. at 13, 695 A.2d 654.]
Justice Handler noted that in Spadoro, the plaintiff did not vigorously pursue the litigation inasmuch as he did not immediately appeal the trial court's decision and did not seek a stay while the matter was on appeal to the Supreme Court. Ibid. In fact, after the trial court's decision, the State made extensive preparations to sell the bonds. Ibid. However, before the Supreme Court decided whether to hear the appeal, the bonds had already been sold. Id. at 14, 695 A.2d 654. Justice Handler noted:
Although the Court could perhaps undo much of what the State has accomplished since the passage of the Bond Act, the many intricate and involved transactions undertaken by the State in reliance on the statute and the trial court's opinion and the certain prospect of substantial government disruption, in combination with the lateness of the appeal, would make judicial relief problematic.
[ Ibid. ]
Here, plaintiff contends the fact the bonds were disseminated into the marketplace should not serve as an impediment to a ruling that they were improperly issued in violation of the New Jersey Constitution. According to plaintiff, the bonds may be redeemed and purchasers, sellers, trustees, and investors were on notice of this eventuality.
In response, defendants cite In re Petition for Referendum to Repeal Ordinance 2354-12 v. Township of West Orange, 223 N.J. 589, 602, 127 A.3d 1277 (2015), for the proposition that once bonds have been disseminated, it is nearly impossible to recall them. The Court in Ordinance 2354-12 stated with respect to municipal bonds:
We cannot dismiss, however, a possible scenario in which a bond ordinance, even past the twenty-day limitation period, must be declared void in the manifest interest of justice. Only in the most extraordinary of circumstances-circumstances that are not presented here and difficult to envision, should a court entertain a request ... challenging an ordinance authorizing the issuance of municipal bonds.
[ Ibid. ]
Defendants argue that many transactions have already been consummated, and millions of dollars have already been spent on *521 the renovation, in reliance on the sale of the bonds. Also, a revocation of the lease agreements would undermine the security for the bonds, which are paid by the monthly rental payments. *329 We agree that, pursuant to Ordinance 2354-12 and Spadoro, only the most "extraordinary of circumstances" would warrant entertaining a challenge to bonds that have already been sold and distributed into the marketplace. We acknowledge that Ordinance 2364 applies to municipal bonds, but the principles expressed in that case apply equally to State-issued bonds. In Spadoro, despite Justice Handler's dissenting opinion, he agreed with the majority that the matter was moot because of the many small transactions that had already occurred in the marketplace in reliance on the bonds. Spadoro, 150 N.J. at 14, 695 A.2d 654. As was stated in Ordinance 2354-12, it would be difficult to envision circumstances that would be so extraordinary as to warrant a recall of the bonds. Such circumstances do not exist here. Accordingly, we agree plaintiff's appeal is technically moot.
Notwithstanding this determination, we observe an important distinction between the present case and Spadoro, where the plaintiff did not pursue the matter vigorously. In fact, in Spadoro, the trial court upheld the bond sale, and we affirmed in an unpublished opinion. Spadoro, 150 N.J. at 3, 695 A.2d 654. However, the plaintiff never requested a stay, and while the matter was pending review by the Supreme Court, the bonds were sold. Ibid.
Here, however, plaintiff filed a complaint the day after the bond resolution was passed. Although plaintiff vigorously pursued the matter and did not delay in filing the complaint, the sale of the bonds had already occurred the same day the resolution was passed. Because the bonds were sold immediately, there was no time after the agency resolution during which plaintiff could have filed an action that would not have been rendered moot by virtue of such sale, thus precluding the opportunity for a meaningful challenge to the bond resolution.
*522 It is true, as defendants contend, that a substantial renovation of the SHC is unlikely to occur again in the foreseeable future. Nevertheless, NJEDA's sale of bonds on the same day it passes a resolution is likely to reoccur in the future when NJEDA effectuates a sale of bonds for other state agencies. Moreover, we recognize the inherent potential for abuse should NJEDA utilize same-day sales to render moot any possible challenges to its bond resolutions and effectively prevent judicial review of the agency's actions.
The trial court properly recognized that the matter is one of substantial importance, as it involved plaintiff and other state legislators asserting constitutional challenges to state agency resolutions.[1] Accordingly, because we conclude the matter is of substantial importance, likely to reoccur in the future, and capable of evading review, we proceed to address the merits of plaintiff's claim that the final agency decisions violate the New Jersey Constitution.[2]
*330 B.
The DLC of the New Jersey Constitution provides that the Legislature may not create "a debt or debts, liability or liabilities *523 of the State" that exceed one percent of the amount appropriated in a given fiscal year unless "submitted to the people at a general election and approved by a majority of ... [New Jersey] voters." N.J. Const. art. VIII, § 2, ¶ 3. The DLC's "animating principle is to prevent well-meaning state actors from presently binding the State to enforceable future financial obligations over a certain amount ... unless voter approval has been secured." Burgos v. State, 222 N.J. 175, 203-04, 118 A.3d 270 (2015). In essence, the DLC "prevent[s] one Legislature from incurring debts which subsequent Legislatures would be obliged to pay, without prior approval by public referendum[.]" N.J. Sports & Exposition Auth. v. McCrane, 61 N.J. 1, 14, 292 A.2d 545 (1972).
In 2008, the DLC was amended as a result of the Supreme Court's decision in Lance v. McGreevey, 180 N.J. 590, 853 A.2d 856 (2004). The 2008 amendment provided that, prospectively, the Legislature could not enact a law that authorizes creation of a debt that has a pledge of an annual appropriation from the Legislature as the means to repay the debt. N.J. Const. art. VIII, § II, ¶ 3.
Notably, the DLC is not implicated when debt is created by an independent authority, distinct from the State that has its own source of revenue. Lonegan v. State, 174 N.J. 435, 446, 809 A.2d 91 (2002) ( Lonegan I ). For example, Enourato v. New Jersey Building Authority, 90 N.J. 396, 402, 448 A.2d 449 (1982), involved the New Jersey Building Authority (BA), which built and operated office facilities for state agencies. The Court noted that so long as the bonds stated on their face that they did not create a financial obligation for the State, they did not contravene the DLC. Ibid. To repay the debt on the bonds, the BA used rents paid by the State. Ibid. The Court found the BA was independent of the State and did not create debt for the State, and therefore, the bonds issued did not violate the DLC, notwithstanding the fact that the rent payments were ultimately paid by the State. Id. at 409-10, 448 A.2d 449.
*524 Similarly, in New Jersey Sports, 61 N.J. at 10, 292 A.2d 545, another independent authority, the New Jersey Sports & Exposition Authority, sold bonds to construct a sports complex. The Court found the Authority was financially self-sustaining and could issue bonds to finance construction, given that the interest and principal of the bonds was paid from moneys collected from use of the sports facility. Ibid.
In Lonegan I, 174 N.J. at 448-50, 809 A.2d 91, the Court expressed that the relevant factors in Enourato and New Jersey Sports were the legal autonomy of the issuing authority and the specific language on the bonds that disclaimed any enforceable obligation on the part of the State. The Court stated it generally sustains the issuance of debt that is not backed by the State when the debt is incurred by an independent authority that has a separate source of revenue. Id. at 439, 809 A.2d 91. Thus, the DLC does not apply when the State is not legally obligated. Ibid.
In Lonegan v. State, 176 N.J. 2, 18, 819 A.2d 395 (2003) ( Lonegan II ), the Court discussed the status of lease arrangements where the "Legislature appropriates the rental payments from general revenues pursuant to a lease agreement, which payments *331 then are used to retire bonds issued to finance the construction of the leased facilities." The Court noted that "[a]s with other types of appropriations-backed debt, the State is not legally bound to make the rental payments and can opt not to do so." Ibid. The Court concluded that the restrictions of the DLC do not apply to this type of "appropriations-backed debt." Id. at 21, 819 A.2d 395.
Plaintiff argues that, in Spadoro, Justice Handler warned against courts permitting the sidestepping of the DLC by substituting an independent authority (such as the NJEDA) as the debtor, instead of the State. It is true that Justice Handler raised this concern, and took issue with the fact that the NJEDA did not have a separate source of income other than the sale of bonds. Spadoro, 150 N.J. at 10, 695 A.2d 654. But in Spadoro, the bonds were used to pay for pensions. Here, the separate source of *525 revenue is the funds generated by rental of the SHC. The lease-leaseback transaction provides a stream of revenue, subject to appropriation, to satisfy the NJEDA's obligations to the bondholders.
Thus, in rejecting plaintiff's argument, we draw guidance from Enourato, where the Court held that leasing property is a reasonable way to repay bond debt. Enourato, 90 N.J. at 409, 448 A.2d 449. Enourato favorably cited Clayton v. Kervick, 52 N.J. 138, 244 A.2d 281 (1968), which discussed this issue:
In [ Clayton ], as here, the Legislature created an independent authority empowered to borrow money and issue bonds that were not the liabilities of the State or any political subdivision. In Clayton, the New Jersey Educational Facilities Authority built school facilities with the borrowed money and leased them to schools, whose rental payments were used to repay the Authority's creditors. The Court held that the Authority's debts were not debts of the State, despite "[t]he fact that the rentals were admittedly geared to satisfy the bonded indebtedness and enable the State ultimately to become the owner of the buildings[.]"
[ Enourato, 90 N.J. at 409, 448 A.2d 449.]
Moreover, as noted, Lonegan II also stands for the proposition that the Legislature's appropriation of amounts for rent payments is not considered as the State's assumption of the debt. Lonegan II, 176 N.J. at 21, 819 A.2d 395. So long as the independent authority does not look to the State to repay the debt, it does not run afoul of the DLC.
Here, consistent with Enourato and Lonegan II, we conclude the issuance of the bonds to finance the SHC renovation did not violate the DLC. This is so because the debt was assumed by the NJEDA, an independent authority, the bonds were used to fund capital expenditures, the bonds stated on their face the State would not be indebted, and the NJEDA had a separate source of revenue, the rental payments, to pay the debt.
Plaintiff additionally argues that the final agency decisions of the NJEDA and the JMC should be reversed because the agencies lacked the authority to sell the bonds and lease the SHC. We disagree.
*526 Ordinarily, an appellate court will reverse the decision of an administrative agency only if it is arbitrary, capricious or unreasonable, or it is not supported by substantial credible evidence in the record as a whole. Mazza v. Bd. of Trs., Police & Firemen's Retirement Sys., 143 N.J. 22, 25, 667 A.2d 1052 (1995). An appellate court, however, is "in no way bound by the agency's interpretation of a statute or its determination of a strictly *332 legal issue" not involving either interpretation of its enabling legislation, or the exercise of agency expertise. Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93, 312 A.2d 497 (1973).
Courts accord wide discretion to administrative agencies to decide "how best to approach legislatively assigned administrative tasks." In re Failure by the Dep't of Banking & Ins., 336 N.J. Super. 253, 262, 764 A.2d 494 (App. Div. 2001). "[P]owers expressly granted to an administrative agency should be liberally construed so that the agency can fulfill the Legislature's purpose." Bd. of Educ. of Upper Freehold Reg'l Sch. Dist. v. State Health Benefits Comm'n, 314 N.J. Super. 486, 492, 715 A.2d 358 (App. Div. 1998) (quoting In re Solid Waste Utility Customer Lists, 106 N.J. 508, 516, 524 A.2d 386 (1987) ). In addition, "an agency's express authority is augmented by such incidental authority as may be reasonably necessary or appropriate to effectuate the expressly delegated authority." Ibid.
Thus, "an agency's authority encompasses all express and implied powers necessary to fulfill the legislative scheme that the agency has been entrusted to administer." In re Virtua-W. Jersey Hosp. Voorhees for Certificate of Need, 194 N.J. 413, 422-23, 945 A.2d 692 (2008). Administrative agencies possess wide discretion and authority to select the means and procedures by which to meet their statutory objectives. Texter v. Dep't of HumanServs., 88 N.J. 376, 383, 443 A.2d 178 (1982).
As noted, the JMC is authorized to maintain, monitor, preserve and improve the SHC, and to safeguard artifacts, documents and objects. N.J.S.A. 52:31-39(a). It also maintains custody of the SHC, with exclusive jurisdiction for maintenance, repair, renovation, *527 improvement, security, parking, furnishing, artifact displays, and space utilization. Ibid. The JMC is also authorized to "enter into agreements with other State agencies or private vendors for the performance of any function or the provision of any service relating to the custody, management or operation of the [SHC]." N.J.S.A. 52:31-40 (emphasis added).
Here, the JMC acted within its delegated authority by approving a renovation of the SHC. Acquiring funds to accomplish the renovation was an implied power of the JMC. Entering the lease agreements that would generate rental payments was consistent with the JMC's responsibility to maintain, preserve, and improve the SHC. In sum, the final agency decisions were in keeping with the agencies' expressly delegated authorities, were not arbitrary, capricious or unreasonable, and were supported by the evidence in the record.
Affirmed.

In addition to plaintiff's action, two similar actions were filed by other State legislators: one by Senators Raymond J. Lesniak, Christopher (Kip) Bateman, and Michael J. Doherty, and another by Senator Richard J. Codey. All three actions were consolidated in the trial court; however, those other legislators do not join in plaintiff's appeal.

Because we elect to address the merits of plaintiff's appeal, and the matter is now properly before us, we need not reach plaintiff's argument that the trial court lacked jurisdiction to hear an appeal of a final agency decision and the matter should be decided by this court. See Prado v. State, 186 N.J. 413, 422, 895 A.2d 1154 (2006) (noting that R. 2:2-3(a)(2) vests the Appellate Division with exclusive jurisdiction of an appeal of a final State administrative agency decision). See also R. 1:13-4(a) (allowing transfer of action from court that lacks jurisdiction to the proper court); R. 1:13-4(b) ("If any action transferable under paragraph (a) because of lack of jurisdiction over the subject matter is appealed without having been transferred, the appellate court may decide the appeal ....").