# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3317-17T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

G.S.,

      Defendant-Appellant.

_____

IN THE MATTER OF E.S.,

      Minor.

_____

Submitted September 9, 2019 – Decided September 23, 2019

Before Judges Sabatino and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Morris County, Docket No. FN-14-0055-15.

Joseph E. Krakora, Public Defender, attorney for appellant (John A. Salois, Designated Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jason Wade Rockwell, Assistant Attorney General, of counsel; Julie Beth Colonna, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; James Joseph Gross, Designated Counsel, on the brief).

PER CURIAM

Defendant, G.S. (Georgia),[1] the paternal grandmother of E.S. (Elle), appeals from a March 30, 2015 Family Part order finding that she abused or neglected Elle, contrary to N.J.S.A. 9:6-8.21(c)(4)(b). The court concluded Georgia failed to protect Elle from the physical and emotional harm caused by her biological father, J.S. (Joshua). She also appeals from the court's February 15, 2018 order terminating the Title Nine litigation and the court's decision approving the plan of the Division of Child Protection and Permanency (Division) to terminate her parental rights.

We affirm the court's abuse and neglect order against Georgia because there was substantial, credible evidence in the record supporting the court's finding that she failed to exercise the requisite minimum degree of care, which

---

[1] We employ initials and pseudonyms to protect the privacy of the parties and child. R. 1:38-3(d)(12).

placed Elle in substantial risk of harm. We also conclude that Georgia's challenge to the court's permanency plan is moot, and was properly entered by the court in any event.

## I.

After a New York court terminated both Joshua's and Elle's biological mother's parental rights, Georgia adopted Elle in 2007, when she was five years old. During all relevant periods, Elle and Georgia lived in a downstairs apartment at the house of Elle's aunt, L.M. (Laura).

The facts underlying the court's abuse and neglect findings stem from Elle's tumultuous relationship with Joshua, which resulted in numerous referrals to the Division regarding Joshua's verbal and physical abuse of Elle. By way of example only, on one occasion Joshua threw a television remote "near" Elle, flung a backpack at her, and emptied its contents on the kitchen floor. Joshua then told Elle to "get out of the house to get to school," and when she was in the driveway, threw rocks at her.

During another incident, Laura contacted the police and reported that Joshua and Elle engaged in a verbal argument "over [Elle's] hygiene and her doing her homework." Later, another argument occurred, and Joshua threw a jug of water at Elle. Laura's fiancé, J.S. (Joe), attempted to intercede. Joshua

3

grabbed Joe by the collar, ripped his shirt, retrieved a rifle from a closet in the apartment, and attempted to load it. Joe jumped on Joshua to stop him, and when Laura called the police, Joshua ran out the back door.

As a result of Joshua's conduct, Georgia agreed to a safety protection plan in which she agreed that "[Joshua] may not be at [her home] at any time, as he is a danger to [Georgia] and [Elle]." Georgia also agreed not to "speak negatively to [Elle] and [to] obtain therapy due to what [Elle] . . . witnessed."

Elle was thereafter evaluated by Michael P. Gentile, M.D., who noted that Elle exhibited "depressed mood, thoughts of suicide, anhedonia, loss of energy, loss of motivation, loss of interest[,] and low energy." Dr. Gentile diagnosed Elle with major depressive disorder and post-traumatic stress disorder. He prescribed Elle with psychiatric medications including a mood stabilizer and antidepressant and recommended individual psychotherapy.[2]

---

[2] Dr. Gentile's conclusions were supported by the opinions of Maria Mendoza, MSW, LSW, and Jane B. Sofair, M.D. Indeed, Mendoza concluded Elle "is an emotionally fragile child who has been diagnosed with [m]ajor [d]epressive [d]isorder." She also noted that Elle "exhibited anger management difficulties during arguments with [Georgia]." With respect to Elle's post-traumatic stress disorder diagnosis, Mendoza noted that Elle "reported that she experiences flashbacks, nightmares, intrusive thoughts, ruminative thoughts, and impaired concentration." Mendoza also noted that Georgia "acknowledged having been inappropriately 'angry and antagonistic' towards [Elle] . . . ." Mendoza concluded that the Division should consider Elle "at high risk for continued

Georgia, however, failed to address Elle's mental health needs. When a Division caseworker asked Georgia if she had made arrangements for Elle to receive therapy, Georgia replied "I give up easily, I admit. There was so much involved." Georgia also stated that with respect to raising Elle, she was "throwing the towel in" and requested that the Division "[t]ake her."

In July 2014, the Division held a family team meeting. Georgia stated to a Division caseworker that she disagreed with Dr. Gentile's recommendation that Elle be treated with medication and that "she did not want [Elle] to become addicted to medications." The next day, the police arrived at the home to address an incident where Elle hit Georgia.

Thereafter, Georgia "refus[ed] both her own and [Elle's] evaluations." Georgia also stated that they did not "need to see [a] therapist every Friday . . . [because] [she and Elle were] not sick."

---

emotional difficulties in [Georgia's] care . . . [and] [Georgia] as a high-risk parent for emotional abuse and failing to protect [Elle] from her father . . . ." Mendoza recommended that both Elle and Georgia participate in counseling individually and together. Mendoza stated that if Georgia failed to comply with services for herself, the Division "may need to consider an alternate placement for [Elle], such as boarding school." Dr. Sofair "concur[red] with Dr. Gentile that it would be medically advisable to initiate a mood stabilizer at [a] low dose to treat [Elle's] irritability and mood swings."

A-3317-17T3

On December 22, 2014, Elle's school reported to the Division that Joshua was again staying at the house with Georgia and Elle. According to Elle's guidance counselor, Elle stated Joshua struck her in the face, knocked her to the ground, and kicked and hit her on the back. Elle had bruises on her back, and her face was sore as a result of the altercation.

The next day, Georgia called a Division caseworker and stated that "[Elle] [had] to leave." She explained that because of the previous incidents, "[Joshua] had to leave[,] and that she instead wanted [Elle] out of the home." That day, the Division instituted an emergency removal of Elle and placed her in a resource home. Additionally, the Division administratively substantiated Georgia for neglect of Elle.

On December 26, 2014, the Division filed an order to show cause and a verified complaint against Georgia for custody of Elle. On the same day, the court concluded that "[c]ontinuation of residence in the home would be contrary to . . . [Elle's] welfare . . . because of allegations that [Elle] was subject to physical abuse by [Joshua][,] and . . . [Georgia][] showed she was unable to protect [Elle] from physical and emotional abuse . . . ." The court provided Georgia with supervised visitation three times per week and "restrained [Joshua] from having any contact with [Elle]."

The court held a Title Nine fact finding hearing concerning the allegations of abuse or neglect on March 11, 2015. The Division presented evidence and witness testimony from Michelle Bauer, a Division intake worker, and Fadia Ferguson, the Division permanency case manager. Georgia also testified on her own behalf. The Law Guardian presented no evidence or witness testimony.

Bauer testified with respect to the altercation that occurred in December 2014 and Elle's subsequent emergency removal. She testified that according to Elle, on December 20, 2014, Joshua "kicked her once or twice in the head and face and . . . was using his arms and his legs." She added that two days later, she observed two bruises on Elle's back and took pictures of them for the case file. Bauer further testified that due to Georgia's request for Elle's removal from her home and repeated statements that she could not "handle" Elle, along with the family's history and the December 20, 2014 incident, the Division determined to conduct an emergency removal.

Ferguson testified as to the Division's involvement with the family since she became the permanency caseworker in March 2014. She stated that the Division and the family implemented safety protection plans, in which Elle's fear of Joshua was documented and it was agreed that he would not be allowed in the home. Ferguson further described the services the Division offered to the

family, such as at-home therapy for Elle, psychiatric and psychological evaluations of Elle, psychological evaluations of Georgia, and individual therapy for Georgia, which she did not consistently attend.

Ferguson also stated that the Division's concerns regarding Georgia's care of Elle were "based around [Elle] reporting being fearful of her father[,] . . . the fact that [Georgia] continued to allow him into the home," and that "[Georgia] spoke very negatively of [Elle]." Ferguson stated that Georgia "didn't appear to believe was [Elle] was fearful" of Joshua.

Georgia testified regarding her care of Elle. With respect to Joshua's involvement in Elle's care, she stated that he was "with [her] making the decisions of the adoptive parent" and that her "interaction with [Joshua] [was her] business . . . ." As to the December 2014 incident that led to Elle's removal, Georgia testified that she was "wedged between [Joshua,] a 260-some-odd-pound man and [Elle,] a very strong girl." She stated that her balance was poor, so she pulled herself away from the altercation to "protect[] [her]self," and went to sit down on a chair in the kitchen, where she could not see Elle or Joshua. However, Georgia testified that she "believe[s] that [Joshua] shoved [and] . . . pushed [Elle]."

With respect to Elle's need for medication to address her psychiatric conditions, Georgia testified that she objected to the recommendations because of "a teenage girl['s] . . . hormones." She denied that anyone discussed "the pros and cons of medication and how it could be administered incrementally," and stated that "narcotics are extremely dangerous." Georgia testified that she did not "want to see [Elle] put on drugs unless it truly was a medical fact that she did need a drug . . . ." As to her intentions for Elle's future care, Georgia testified that she wanted Elle in her care, that she would obtain a restraining order against Joshua, and that she would be willing to engage in services.

At the conclusion of the fact finding proceeding, Judge Maritza Berdote Byrne, relying mostly on Georgia's statements against her own interests, issued a thorough oral decision in which she concluded that, based on the "documentary evidence and credible testimony of the witnesses," the Division "established the allegations of abuse and neglect [against Georgia] by a preponderance of the evidence . . . ." Specifically, the court found that Georgia's knew Joshua was not to be allowed in the home with Elle before the December 20, 2014 altercation occurred and that he had a "proclivity toward violence." Judge Berdote Byrne further found that Georgia could not control Joshua, and noted her admission that "she couldn't take care of [Elle]."

The court determined that Georgia "lack[ed] insight into [Elle's] parenting needs." In this regard, the court noted that Georgia's refusal to follow the medical evaluations recommending that Elle be medicated accompanied by her "refusal to believe that [Joshua] presented a risk of harm to [Elle,] . . . placed [Elle] at a substantial risk of [imminent] harm."

At two subsequent permanency hearings, the court accepted the Division's permanency plan of kinship legal guardianship (KLG). On January 26, 2016, the court reasoned that KLG was appropriate due to Georgia's lack of therapeutic progress, and on September 26, 2016, the court agreed to a KLG plan leading to reunification. At a third permanency hearing, however, the Division presented a plan for reunification with Georgia, as Elle, then fifteen years old, refused to be adopted.

The Law Guardian opposed the Division's plan for reunification, concluding it was unsafe to return Elle to Georgia's care. Noting that there was "no . . . kinship legal guardian available," the Law Guardian requested another permanency hearing to evaluate Elle's desired plan of independent living once she turned sixteen. The court disagreed and found the Division's plan for reunification to be appropriate, stating that Elle and Georgia needed a functional

10

goal to work towards. The court provided for visitation to be supervised by Elle and Georgia's respective therapists.

At an August 24, 2017 hearing, the court noted Georgia's continued rejection of individual therapy. Thereafter, at a December 14, 2017 permanency hearing, the court found that the Division made "clearly reasonable efforts . . . in the provision of services . . . in a variety of ways to see if reunification can be achieved." The court, however, determined that because Elle was entitled to permanency after three years and Georgia's reunification efforts were "detached . . . from the reality of this case," the Division's plan for termination of Georgia's parental rights followed by adoption by the resource parent was appropriate.

The Division filed a guardianship complaint after which the court entered the February 15, 2018 order finally terminating the Title Nine litigation and this appeal followed. After the instant appeal was perfected, on June 21, 2018, the Division withdrew its guardianship complaint in favor of a permanency plan of independent living for Elle, who is now seventeen years old.[3]

---

[3] The trial court also issued a February 27, 2019 order, over Georgia's objection, maintaining the Division's rights to the care, custody, and supervision of Elle, and allowing Elle to make "medical" and "education[al]" decisions. We denied Georgia's motion for interlocutory review of that order and she has not sought further review before us or the Supreme Court.

A-3317-17T3

Appellate review of a trial judge's factual findings in Title Nine cases is limited. We accord deference to the trial court's credibility and factual findings, so long as those findings are supported by "adequate, substantial, and credible evidence." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 278-79 (2007) (quoting In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993)). We accord such deference to "the trial court because it has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008). Accordingly, the trial court's findings of fact will not be overturned "unless they are so wide of the mark that [an appellate court's] intervention is necessary to correct an injustice." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 449 (2012).

Georgia first asserts that, contrary to the trial court's decision, she "exercised the appropriate level of care" of Elle. She explains that her failure to prevent Joshua from entering her home and decision not to place Elle on medication do not rise to the level of "gross and wanton negligence." Georgia further asserts that there was no evidence of harm or risk of imminent harm

12

caused by her actions.  Rather, she maintains that the evidence supports a finding

of abuse or neglect only against Joshua.  We disagree.

"Abuse and neglect actions are controlled by the standards set forth in

Title Nine of the New Jersey Statutes."  N.J. Div. of Youth & Family Servs. v.

P.W.R., 205 N.J. 17, 31 (2011).  Title Nine's purpose "is to provide for the

protection of children under [eighteen] years of age who have had serious injury

inflicted upon them."  Ibid. (quoting N.J.S.A. 9:6-8.8).  Critical to the Title Nine

process is the fact-finding hearing.  N.J. Div. of Youth & Family Servs. v. J.Y.,

352 N.J. Super. 245, 264 (App. Div. 2002). "The judge, as the fact-finder, is

there 'to determine whether the child is an abused or neglected child as defined'"

in N.J.S.A. 9:6-8.21(c).  Ibid. (quoting N.J.S.A. 9:6-8.44).  Accordingly, this

determination "must be based on a preponderance of the evidence[,] and . . .

only competent, material[,] and relevant evidence may be admitted."  N.J.S.A.

9:6 8.46.

N.J.S.A.  9:6-8.21(c)  provides,  in  relevant  part,  that  an  "abused  or

neglected child" is a child under eighteen:

> whose physical, mental, or emotional condition has
> been impaired or is in imminent danger of becoming
> impaired as the result of the failure of his parent or
> guardian, as herein defined, to exercise a minimum
> degree of care . . . in providing the child with proper
> supervision or guardianship, by unreasonably inflicting

or allowing to be inflicted harm, or substantial risk thereof . . . .

A "'minimum degree of care' refers to conduct that is grossly or wantonly negligent, but not necessarily intentional." G.S. v. Dep't of Human Servs., 157 N.J. 161, 178 (1999). Our Supreme Court has held that "a guardian fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." Id. at 181. A court's "inquiry should focus on the harm to the child and whether that harm could have been prevented had the guardian performed some act to remedy the situation or remove the danger." Id. at 182. Thus, "[w]hen a cautionary act by the guardian would prevent a child from having his or her physical, mental[,] or emotional condition impaired, that guardian has failed to exercise a minimum degree of care as a matter of law." Ibid.

Here, Judge Berdote Byrne's finding that Georgia failed to exercise a minimum degree of care is supported by substantial credible evidence in the record and is entitled to our deference. Indeed, Georgia knew, as evidenced by the signed safety protection plans, that Joshua was not to be permitted in the home, as he presented a safety risk to Elle. She nevertheless repeatedly allowed him into her home, fully aware that Joshua and Elle's interactions were likely to

14

result in violence. The evidence presented at the fact finding proceeding established that Georgia was incapable of protecting Elle from Joshua's violent and abusive behavior, which placed Elle in a substantial risk of harm.

Despite Georgia's claims that she could not have prevented Joshua from entering the home because it was owned by Laura, Georgia's own testimony reflects that her downstairs apartment was maintained separately as her own residence. Further, as Elle's guardian, it was Georgia's responsibility to ensure that Joshua was not residing in the same home as Elle.

In addition, Georgia's failure to address Elle's mental health issues also constituted a failure to exercise a minimum degree of care. Georgia ignored the recommendations of two doctors who both recommended that due to Elle's significant psychiatric conditions, Elle needed medication to help with her behavioral issues. Georgia also failed to ensure that Elle consistently received the psychological counseling she desperately needed.

### III.

Georgia also asserts that the court erred in approving the plan of terminating her parental rights because the Division's plan was not in Elle's best interests. She further contends that the Division failed to make reasonable

efforts to provide her with services to aid in reunification with Elle before changing its permanency plan to termination of parental rights.

We are unpersuaded by these arguments for two independent reasons. First, we determine the issues are moot. Second, even were we to consider the merits of Georgia's arguments, we conclude the court's decision to approve a permanency plan of termination of parental rights was supported by the record.

We consider an issue moot if "our decision . . . can have no practical effect on the existing controversy." Wisniewski v. Murphy, 454 N.J. Super. 508, 518 (App. Div. 2018) (citations omitted). "When a party's rights lack concreteness from the outset or lose it by reason of developments subsequent to the filing of suit, the perceived need to test the validity of the underlying claim of right in anticipation of future situations is, by itself, no reason to continue the process." State v. Davila, 443 N.J. Super. 577, 584 (App. Div. 2016) (quoting JUA Funding Corp. v. CNA Ins./Cont'l Cas. Co., 322 N.J. Super. 282, 288 (App. Div. 1999)). "[C]ourts of this state do not resolve issues that have become moot due to the passage of time or intervening events." Ibid. (alteration in original) (quoting City of Camden v. Whitman, 325 N.J. Super. 236, 243 (App. Div. 1999)). Here, our decision would have no "practical effect" on the court's decision to permit the Division to file a guardianship complaint in light of court's

16

modification of the permanency plan from termination of parental rights to independent living, and the attendant withdrawal by the Division of the guardianship complaint. See Wisniewski, 454 N.J. Super. at 518.

Second, the record supports the court's determination that the Division made reasonable efforts towards reunification. See N.J.S.A. 30:4C-61.2(d) (providing that a court must "make a specific finding of the reasonable efforts made" by the Division); N.J.S.A. 9:6-8.54(b)(2); N.J.S.A. 30:4C-61.2(a)(2). In addition to individual therapy for Elle, the Division provided her with psychological evaluations, psychiatric evaluations, at-home therapy, and family therapy. Further, the Division provided Georgia with psychological evaluations, individual and family therapy, and supervised visitation with Elle upon her removal.

The Division's permanency plan changed from reunification to termination of parental rights was based on Georgia's failure to adequately engage in services provided by the Division to remedy the circumstances that led to Elle's removal. She repeatedly failed to attend individual therapy sessions, and thus failed to make sufficient progress to allow for reunification.

To the extent we have not specifically addressed any of Georgia's remaining arguments, we conclude they are without sufficient merit and do not warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

18

A-3317-17T3