**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3616-19
                A-3873-19

BAYSHORE ENTERPRISES,
INC., d/b/a CAR WASH AND
BEYOND, JERSEY SHORE
HAIR, INC. d/b/a RAZBERRI
HAIR & NAIL DESIGN, PERFECT
SWING GOLF, LLC, SCOTT
CONVERY, JUSTIN TUCKER,
ALLISON LANZANO, GINA
DIPASQUALE, ISABELLA
GHANBARY, ELIZABETH
CIOCHER, MADISON KELLY,
ELAN HAIR STUDIO, BELLA
SALON OF MANCHESTER, INC.,
DIMENSIONAL DESIGNS, INC.,
G'S GYM, LLC, SALON DIMARIA,
INC., PANICO SALON,
MOMENTS TO REMEMBER, INC.,
t/a CHARLES EDWARDS SALON
and BANT INC., t/a MARTINS
CASUALS,

      Plaintiffs-Appellants,

v.

PHILIP D. MURPHY, in his official
capacity as the Governor of the State
of New Jersey, PATRICK J.

CALLAHAN, in his official capacity as the State Director of Emergency Management and as Superintendent of the New Jersey State Police, State of New Jersey Department of Education, DR. LAMONT REPOLLET, in his official capacity as Commissioner of the New Jersey Department of Education, and ADBULSALEEM HASAN, in his official capacity as Assistant Commissioner of the New Jersey Department of Education,

       Defendants-Respondents.

_____

NEW JERSEY REPUBLICAN STATE COMMITTEE, JOHN E. POSTAS, d/b/a POSTAS BARBER SHOP, 54TH STREET LIQUOR, LLC, d/b/a EASTLYN GOLF COURSE & THE GREENVIEW INN, MIZZITRAINING, LLC, and BUCKET BRIGADE BREWERY, LLC,

       Plaintiffs-Appellants,

v.

PHILIP D. MURPHY, in his official capacity as the Governor of the State of New Jersey, GURBIR S. GREWAL, in his official capacity as Attorney General of the State of New Jersey, and PATRICK J. CALLAHAN, in his official capacity as Superintendent of

2

the New Jersey Division of State Police
and as State Director of Emergency
Management,

Defendants-Respondents.

_____

Submitted June 1, 2021 – Decided July 23, 2021

Before Judges Rothstadt, Mayer, and Susswein.

On appeal from Executive Orders No. 103, et seq., 107
and 151, pursuant to transfers from the Superior Court
of New Jersey, Chancery Division, Ocean County,
Docket No. C-000070-20 and Law Division, Cape May
County, Docket No. L-0168-20.

R.C. Shea & Associates, attorneys for appellants in A-
3616-19 (Michael J. Deem, of counsel and on the brief).

Lavery, Selvaggi, Abromitis & Cohen, and Testa,
Heck, Testa & White, PA, attorneys for appellants in
A-3873-19 (Michael B. Lavery and Michael L. Testa,
Jr., of counsel and on the briefs; William H. Pandos, on
the briefs).

Gurbir S. Grewal, Attorney General, attorney for
respondents (Jeremy M. Feigenbaum, State Solicitor,
and Kevin R. Jespersen, Assistant Attorney General, of
counsel and on the briefs; Deborah A. Hay and Kai W.
Marshall-Otto, Deputy Attorneys General, on the
briefs).

PER CURIAM

These consolidated appeals challenge the validity of Executive Orders

(EOs) issued by New Jersey's governor in response to the coronavirus (Covid-

19) pandemic that infected and spread across almost the entire world since at least early 2020. In A-3616-19, appellants (Bayshore appellants) challenge EOs 103–186 and argue the following points:

POINT I

GOVERNOR MURPHY'S [EOS] 103 THROUGH 186, AS THEY PERTAIN TO A PUBLIC HEALTH EMERGENCY, ARE UNENFORCEABLE BECAUSE THE GOVERNOR FAILED TO COMPLY WITH THE PROCEDURES SET FORTH IN THE EMERGENCY HEALTH POWERS ACT, [(EHPA)] N.J.S.A. 26:13-1 [to -31].

POINT II

THE UNPRECEDENTED STAY AT HOME COMMAND FOUND IN [EO] 107 FAILED TO COMPLY WITH THE ESTABLISHED DUE PROCESS PROCEDURES SET FORTH IN N.J.S.A. 26:13-15 FOR QUARANTINING AND ISOLATING INDIVIDUALS.

POINT III

GOVERNOR MURPHY'S [EOS] 103 THROUGH 186, AS THEY PERTAIN TO A PUBLIC HEALTH EMERGENCY, ARE NO LONGER ENFORCEABLE BECAUSE THE GOVERNOR CANNOT DEMONSTRATE THE PRESENCE OF A PUBLIC HEALTH EMERGENCY AS DEFINED UNDER THE [EHPA], N.J.S.A. 26:13-2.

POINT IV

WITHOUT AN EMERGENCY GOVERNOR MURPHY DOES NOT HAVE THE AUTHORITY TO ISSUE ON GOING [SIC] COVID-19 [EOS] UNDER THE CIVILIAN DEFENSE ACT AND DISASTER CONTROL ACT, [(DISASTER CONTROL ACT)], N.J.S.A. APP. [A:9-30 TO -63], THEREFORE THE GOVERNOR'S COVID-19 [EOS] SHOULD NO LONGER BE EXTENDED.

Appellants in A-3873-19 (RSC appellants) challenge EO 107 and argue the following two points:

POINT I:

GOVERNOR MURPHY'S EXECUTIVE ACTION TO SHUTTER BUSINESSES AND RESTRICT COMMERCE DURING THE COVID-19 PANDEMIC VIOLATES THE EQUAL PROTECTION CLAUSE OF THE NEW JERSEY CONSTITUTION.

POINT II:

GOVERNOR MURPHY'S EXECUTIVE ACTION TO SHUTTER BUSINESSES AND RESTRICT COMMERCE DURING THE COVID-19 PANDEMIC VIOLATES THE SUBSTANTIVE DUE PROCESS CLAUSE OF THE NEW JERSEY CONSTITUTION.

Since the filing of these appeals, much has changed about the pandemic because of the introduction of preventative health measures and vaccines that thwart the spread of the deadly virus that has so far taken the lives of in excess of 600,000 people in our country, including 23,687 in New Jersey. Most recently, and after these appeals were submitted for our consideration, New

5

Jersey enacted L. 2021, c. 103, recognizing the diminution of Covid-19's impact on its citizens and effectively terminating most of the Covid-19 related EOs as of July 4, 2021, including orders numbered 104, 107, and 151.  Also, the Governor issued a new EO, numbered 244, that terminated the public health emergency he originally declared in EO 103.  Exec. Order No. 244 (June 4, 2021), ___ N.J.R. ___ (____).

According to defendants, these actions have rendered the issues before us moot because any "decision [by us] would thus have no practical effect."  The Bayshore appellants disagree and contend that because the recently enacted legislation leaves the Governor with "the ability to re-impose the restrictive and unconstitutional Orders at any time" the issues fall into the category of cases that "are of substantial importance, likely to reoccur, and capable of evading review."  The RSC appellants further argue that under the "voluntary cessation doctrine" the appeals are not moot.

"Mootness is a threshold justiciability determination rooted in the notion that judicial power is to be exercised only when a party is immediately threatened with harm."  Stop & Shop Supermarket Co., LLC v. Cnty. of Bergen, 450 N.J. Super. 286, 291 (App. Div. 2017) (quoting Betancourt v. Trinitas Hosp., 415 N.J. Super. 301, 311 (App. Div. 2010)).  "[F]or reasons of judicial

economy and restraint, courts will not decide cases in which the issue is hypothetical, [or] a judgment cannot grant effective relief." Ibid. (alterations in original) (quoting Cinque v. N.J. Dep't of Corr., 261 N.J. Super. 242, 243 (App. Div. 1993)). Furthermore, "[a]n issue is 'moot' when the decision sought in a matter, when rendered, can have no practical effect on the existing controversy." Comando v. Nugiel, 436 N.J. Super. 203, 219 (App. Div. 2014) (alteration in original) (quoting Greenfield v. N.J. Dep't of Corr., 382 N.J. Super. 254, 257-58 (App. Div. 2006)).

We have carefully considered the parties' contentions in light of these governing legal principles and conclude that the issues before us are moot and for that reason, both appeals are dismissed.

I.

In order to give context to our determination that the issues raised by appellants are moot, we begin by reviewing the challenged EOs and the relief sought by the parties. We choose not to recite in detail either the nature of the pandemic, its effect on our health care system and the people employed in the health care fields, its tragic impact on our population and economy, the world's response, or our federal government's actions or omissions during the past year and a half. We are confident that these facts are not only well known to the

7

parties before us, but also to the general public.[1]  We turn to the orders issued

in response to the pandemic.

---

[1]  As of June 21, 2021, New Jersey reported a history of 891,483 cases and 23,687 Covid-19 related deaths.  As of the same date, in excess of 4.8 million New Jersey residents have been fully vaccinated, and 5.2 million partially vaccinated from its population of approximately 8.8 million people.

During the almost year and half since Covid-19's appearance, our courts have had occasion to address its impact on New Jersey citizens.  See, e.g., N.J. Republican State Comm. v. Murphy, 243 N.J. 574 (2020) (addressing government borrowing to respond to Covid-19 emergency); In re Request to Modify Prison Sentences, 242 N.J. 357 (2020) (addressing Covid-19 in context of State prisons and juvenile facilities); Singh v. Murphy, No. A-0323-20 (App. Div. Oct. 21, 2020) (addressing Covid-19 in context of elections), certif. denied, 244 N.J. 329 (2020), cert. denied, 141 S. Ct. 1373 (2021).  Indeed, our courts have recognized the significant public health threat posed by Covid-19.  In re Request to Release Certain Pretrial Detainees, 245 N.J. 218, 226, 230, 236 (2021); N.J. Republican State Comm., 243 N.J. at 580-81; State v. Smith, 465 N.J. Super. 515, 522-23 (App. Div. 2020).  In August 2020, the Court stated: "Laypeople, scientists, and legal scholars alike would agree that COVID-19 is a true disaster with widespread consequences.  The pandemic has caused a health emergency, a broad-based economic one that has devastated many individuals and families, and a fiscal crisis for the State."  N.J. Republican State Comm., 243 N.J. at 580-81.  In February 2021, the Court stated, "COVID-19 has created an ongoing health crisis of enormous proportions for all of society," and recognized that the pandemic was of "unexpected duration," with "no clear end date."  In re Request to Release Certain Pretrial Detainees, 245 N.J. at 226, 230, 236.

Courts across the nation similarly have recognized that Covid-19 presents a public health crisis, as they have been presented with a myriad of issues stemming from the virus and the actions taken to limit its spread.  See, e.g., Cassell v. Snyders, 990 F.3d 539, 543 (7th Cir. 2021); S. Bay United Pentecostal Church v. Newsom, 985 F.3d 1128, 1131-36 (9th Cir. 2021); Big Tyme Invs.,

On February 3, 2020, Governor Murphy issued EO 102, setting forth then-known facts about Covid-19, and establishing a coronavirus task force. Exec. Order No. 102 (Feb. 3, 2020), 52 N.J.R. 366(b) (Mar. 2, 2020). The task force was staffed by employees of the New Jersey Department of Health (DOH), chaired by the Commissioner of the DOH, and consisted of agency heads or their designees from the Department of Human Services, the Department of Law and Public Safety, the New Jersey State Police, the Department of Education (DOE), and the Office of Homeland Security and Preparedness. It reported directly to the Office of the Governor and was "charged with coordinating all State efforts to appropriately prepare for and respond to the public health hazard posed by the virus," including consulting and coordinating with State departments and agencies, the federal government, hospitals and other health care facilities, and local health departments. Ibid.

As discussed in greater detail infra, the Governor also issued numerous additional EOs, responding to the ever-evolving public health threat created by

LLC v. Edwards, 985 F.3d 456, 460-61 (5th Cir. 2021); Beshear v. Acree, 615 S.W.3d 780, 830 (Ky. 2020); Desrosiers v. Governor, 158 N.E.3d 827, 831-32 (Mass. 2020); Grisham v. Romero, 483 P.3d 545, 548-50 (N.M. 2021); Friends of Danny DeVito v. Wolf, 227 A.3d 872, 888-91 (Pa.), cert. denied, 141 S. Ct. 239 (2020); Fisher v. Hargett, 604 S.W.3d 381, 386-87 (Tenn. 2020); In re Recall of Snaza, 480 P.3d 404, 406 (Wash. 2021).

A-3616-19

Covid-19.[2] As legal authority for the EOs, the Governor cited to the New Jersey Constitution, the EHPA, and the Disaster Control Act, as well as statutes permitting the Governor to activate the National Guard, N.J.S.A. 38A:2-4 and N.J.S.A. 38A:3-6.1. The Governor also held regular public briefings in which he and members of the Coronavirus Task Force spoke to the public about the State's responsive measures. And, the State operated a website with up-to-date Covid-19 information.[3]

<u>Spring 2020 Executive Orders</u>

The Governor first declared a public health emergency and state of emergency on March 9, 2020. <u>Exec. Order No. 103</u> (Mar. 9, 2020), 52 N.J.R. 549(a) (Apr. 6, 2020). In EO 103, the Governor reviewed known facts about Covid-19 and acknowledged the public health emergencies announced by the World Health Organization (WHO) and the Department of Health and Human Services (DHHS). <u>Ibid.</u> The Governor then stated that "the spread of COVID-19 within New Jersey constitutes an imminent public health hazard that threatens and presently endangers the health, safety, and welfare of the residents

---

[2] <u>See</u> https://nj.gov/infobank/eo/056murphy/.

[3] <u>See</u> Governor's YouTube channel https://www.youtube.com/channel/UCH8YwF0eRl9E5lpGj8OaiLg; <u>see also</u> https://covid19.nj.gov/.

of one or more municipalities or counties of the State," and "it is necessary and appropriate to take action against this public health hazard to protect and maintain the health, safety, and welfare of New Jersey residents and visitors." Ibid.

The Governor declared a public health emergency and state of emergency, and invoked the authorities granted to him under the State Constitution and various State statutes, including the EHPA and Disaster Control Act. Ibid. Among other things, the Governor authorized and empowered the State Director of Emergency Management (OEM Director) in conjunction with the Commissioner of the DOH, to take any emergency measures as he may determine to be necessary "in order to fully and adequately protect the health, safety and welfare of the citizens of the State of New Jersey from any actual or potential threat or danger that may exist from the possible exposure to COVID-19," and to coordinate the relief effort from the emergency, including coordinating the work of state, regional, and local political bodies and agencies to implement the EO. Ibid.[4]

---

[4] On a monthly basis thereafter, the Governor declared that the public health emergency and state of emergency continued to exist, based on a number of cited facts as well as his "consultation[s] with the Commissioner of DOH," and he ordered and directed that all Covid-19 EOs remain in full force and effect. See

<u>EO 104:  Business Closures and Restrictions</u>

The Governor issued EO 104 on March 16, 2020, just a week after he first declared a public health emergency.  <u>Exec. Order No. 104</u> (Mar. 16, 2020), 52 N.J.R. 550(a) (Apr. 6, 2020).  In EO 104, the Governor cited known facts about Covid-19, as well as current guidance and recommendations from the CDC and Dr. Anthony Fauci of the National Institute of Allergy and Infectious Diseases, and ordered and directed, among other things, that (1) gatherings be limited to fifty persons or fewer, with certain exceptions; (2) schools and institutions of higher education cease in-person instruction, with exceptions; (3) a number of specified businesses be closed, including casinos, racetracks, gyms and fitness centers, and entertainment centers such as movie theaters, performing art centers, concert venues, and nightclubs, with the OEM Director permitted to

<u>Exec. Order No. 119</u> (Apr. 7, 2020), 52 N.J.R. 956(a) (May 4, 2020); <u>Exec. Order No. 138</u> (May 6, 2020), 52 N.J.R. 1107(b) (June 1, 2020); <u>Exec. Order No. 151</u> (June 4, 2020), 52 N.J.R. 1300(a) (July 6, 2020); <u>Exec. Order No. 162</u> (July 2, 2020), 52 N.J.R. 1475(a) (Aug. 3, 2020); <u>Exec. Order No. 171</u> (Aug. 1, 2020), 52 N.J.R. 1634(a) (Sept. 8, 2020); <u>Exec. Order No. 180</u> (Aug. 27, 2020), 52 N.J.R. 1711(a) (Sept. 21, 2020); <u>Exec. Order No. 186</u> (Sept. 25, 2020), 52 N.J.R. 1880(a) (Oct. 19, 2020); <u>Exec. Order No. 191</u> (Oct. 24, 2020), 52 N.J.R. 2034(a) (Nov. 16, 2020); <u>Exec. Order No. 200</u> (Nov. 22, 2020), 52 N.J.R. 2157(a) (Dec. 21, 2020); <u>Exec. Order No. 210</u> (Dec. 21, 2020), 53 N.J.R. 98(b) (Jan. 19, 2021); <u>Exec. Order No. 215</u> (Jan. 19, 2021), 53 N.J.R. 192(a) (Feb. 16, 2021); <u>Exec. Order No. 222</u> (Feb. 17, 2021), 53 N.J.R. 398(a) (Mar. 15, 2021); <u>Exec. Order No. 231</u> (Mar. 17, 2021), 53 N.J.R. 579(a) (Apr. 19, 2021).  All EOs can be found at https://nj.gov/infobank/eo/056murphy/.

A-3616-19

amend the list of businesses ordered to be closed; (4) other non-essential retail, recreational, and entertainment businesses must cease operations between 8:00 p.m. and 5:00 a.m., and in other hours must limit their occupancy to no more than fifty persons and adhere to social distancing guidelines; (5) "essential businesses" were excluded from the limitations applicable to non-essential businesses, with examples of essential businesses identified, and the OEM Director was permitted to amend the list of essential businesses; and (6) restaurants and bars were limited to food delivery and take-out services. Ibid.

## EO 107: Stay-At-Home Order and Additional Business Closures and Restrictions

The Governor issued EO 107 on March 21, 2020, twelve days after he issued the first declaration of a public health emergency. Exec. Order No. 107 (Mar. 21, 2020), 52 N.J.R. 554(a) (Apr. 6, 2020). In EO 107, the Governor noted the rapid spread of Covid-19 in the United States, and New Jersey in particular, through person-to-person contact when individuals are within six feet or less of one another. Ibid. The Governor also noted recommendations made by the federal government that individuals practice social distancing in order to prevent the spread of Covid-19 and that, for the next eight weeks, individuals avoid gatherings of more than ten people. Ibid.

The Governor determined that it was necessary to strengthen the State's efforts to slow the spread of the virus and preserve the health care system's capacity to treat those who required emergency or intensive care. Thus, the Governor superseded EO 104.[5]  Ibid.  Although EO 107 generally required

---

[5] EO 107 specifically stated:

> 2.  All New Jersey residents shall remain home or at their place of residence unless they are 1) obtaining goods or services from essential retail businesses . . . ; 2) obtaining takeout food or beverages from restaurants, other dining establishments, or food courts . . . ; 3) seeking medical attention, essential social services, or assistance from law enforcement or emergency services; 4) visiting family or other individuals with whom the resident has a close personal relationship, such as those for whom the individual is a caretaker or romantic partner; 5) reporting to, or performing, their job; 6) walking, running, operating a wheelchair, or engaging in outdoor activities with immediate family members, caretakers, household members, or romantic partners while following best social distancing practices with other individuals, including staying six feet apart; 7) leaving the home for an educational, religious, or political reason; 8) leaving because of a reasonable fear for his or her health or safety; or 9) leaving at the direction of law enforcement or other government agency.
>
> 3.  When in public, individuals must practice social distancing and stay six feet apart whenever practicable, excluding immediate family members, caretakers, household members, or romantic partners.

14

individuals to stay at home, it included significant exceptions. Among other things, it permitted individuals to leave their homes in order to go to work, visit with family members and individuals with whom they had close personal relationships, engage in outdoor activities, shop at essential retail businesses, pick up take-out food and beverages from dining establishments, and for educational, religious, or political reasons. Ibid. The stay-at-home provision of EO 107 applied to the entire State population. It was not targeted at certain individuals.

Also in EO 107, the Governor ordered that "[t]he brick-and-mortar premises of all non-essential retail businesses must close to the public as long as this Order remains in effect." Ibid. However, essential retail businesses were excluded from this directive, albeit with social distancing practices maintained, and online and telephonic delivery services being permitted. Ibid. EO 107 set

----

. . . .

> 5.   Gatherings of individuals, such as parties, celebrations, or other social events, are cancelled, unless otherwise authorized by any part of this Order. The [OEM Director] shall have the discretion to make clarifications and issue orders related to this provision.
>
> [Ibid.]

forth a list of essential businesses, which could be amended by the OEM Director. Ibid. See also Exec. Order No. 122 (Apr. 8, 2020), 52 N.J.R. 959(a) (May 4, 2020) (among other things, imposing additional limitations and mitigation strategies on essential businesses, including a fifty percent capacity limitation and mandated mask-wearing).

EO 107 also maintained the limits on restaurants and bars to delivery and take-out and maintained the closure of recreational and entertainment businesses, with the list of such businesses expanded to include: casinos, racetracks, gyms and fitness centers and classes, entertainment centers, the indoor portions of retail shopping malls, places of public amusement, places where personal care services were performed, and municipal, county, and State public libraries, and libraries and computer labs at public and private colleges and universities. Exec. Order No. 107 (Mar. 21, 2020), 52 N.J.R. 554(a) (Apr. 6, 2020).

Finally, EO 107 directed all businesses and non-profits to accommodate their workforce, wherever practicable, with telework or work-from-home arrangements and maintained the restrictions on schools and institutions of higher education. Ibid.

16

On May 21, 2020, the RSC appellants filed their complaint in the Law Division, alleging the EOs violated the State Constitution and seeking declaratory and injunctive relief that would enjoin the Governor from enforcing the EOs or ever "issuing any future orders or rules similar" to the ones challenged in the complaint. The next day, the Bayshore appellants filed a first amended verified complaint in the Law Division[6] alleging the Governor's Covid-19 EOs were promulgated in violation of State statutory and constitutional law and seeking both injunctive relief barring enforcement of the EOs and a declaration that the EOs were void and unenforceable.[7]

Relaxing of Restrictions

Immediately preceding the filing of the two actions, the Governor responded to the first wave of Covid-19 infections beginning to wane by relaxing the previously imposed restrictions. To assist him in that effort, on April 28, 2020, the Governor created a "Restart and Recovery Commission," charged with "provid[ing] guidance to the Governor for reopening the New

---

[6] We have not been provided with a copy of the Bayshore appellants' original complaint.

[7] On May 26, 2020, and June 11, 2020, the Law Division entered orders transferring the matters to the court under Rule 1:13-4.

Jersey economy in a way that is consistent with the State's public health efforts to slow the spread of COVID-19." Exec. Order No. 131 (Apr. 28, 2020), 52 N.J.R. 1099(a) (June 1, 2020). And, on May 8, 2020, the Governor created a second advisory body, dubbed the "Restart and Recovery Advisory Council," to "provide guidance to the Governor on the reopening and recovery of New Jersey's economy, taking into account the unique facets of New Jersey's economy and society." Exec. Order No. 140 (May 8, 2020), 52 N.J.R. 1231(b) (June 15, 2020).

Beginning in the spring of 2020, the Governor issued EOs that permitted the reopening of many previously closed facilities and businesses, subject to limitations that were intended to mitigate the spread of the virus, including capacity limitations and mandates for social distancing, mask-wearing, and sanitization.[8] As stated in the EOs, the re-openings reflected: increases in the

_____

[8] See, e.g., Exec. Order No. 133 (Apr. 29, 2020), 52 N.J.R. 1101(a) (June 1, 2020) (reopening State parks and forests, and permitting reopening of county and municipal parks and golf courses); Exec. Order No. 142 (May 13, 2020), 52 N.J.R. 1233(a) (June 15, 2020) (permitting reopening of construction projects, permitting individuals in vehicles to gather, and permitting non-essential retail businesses to reopen to public for curbside pickup); Exec. Order No. 143 (May 14, 2020), 52 N.J.R. 1235(a) (June 15, 2020) (permitting beaches, boardwalks, lakes, and lakeshores to remain open); Exec. Order No. 145 (May 15, 2020), 52 N.J.R. 1240(a) (June 15, 2020) (permitting elective surgeries to resume); Exec. Order No. 146 (May 16, 2020), 52 N.J.R. 1241(a) (June 15, 2020) (permitting

charter fishing and watercraft rental businesses to reopen); Exec. Order No. 147 (May 18, 2020), 52 N.J.R. 1243(a) (June 15, 2020) (permitting reopening of certain outdoor recreational businesses and activities); Exec. Order No. 148 (May 22, 2020), 52 N.J.R. 1245(a) (June 15, 2020) (setting rules for outdoor gatherings and permitting reopening of recreational campgrounds); Exec. Order No. 149 (May 29, 2020), 52 N.J.R. 1297(a) (July 6, 2020) (permitting resumption of child care services, youth day camps, and outdoor organized sports); Exec. Order No. 150 (June 3, 2020), 52 N.J.R. 1298(a) (July 6, 2020) (among other things, permitting outdoor dining and permitting non-essential retail businesses to open subject to same limitations applied to essential businesses); Exec. Order No. 152 (June 9, 2020), 52 N.J.R. 1301(a) (July 6, 2020) (addressing numbers of persons permitted to gather indoors and outdoors); Exec. Order No. 153 (June 9, 2020), 52 N.J.R. 1303(a) (July 6, 2020) (permitting reopening of outdoor pools, and outdoor spaces of recreational and entertainment businesses, and rescinding stay-at-home order); Exec. Order No. 154 (June 13, 2020), 52 N.J.R. 1355(a) (July 20, 2020) (permitting personal care service facilities to reopen); Exec. Order No. 155 (June 18, 2020), 52 N.J.R. 1356(a) (July 20, 2020) (permitting limited in-person instruction at institutions of higher education and trade and training schools); Exec. Order No. 156 (June 22, 2020), 52 N.J.R. 1358(a) (July 20, 2020) (increasing indoor and outdoor gathering capacity limits); Exec. Order No. 157 (June 26, 2020), 52 N.J.R. 1455(a) (Aug. 3, 2020) (among other things, establishing rules for retail establishments, indoor dining, indoor recreational facilities, and individualized instruction at gyms and fitness centers); Exec. Order No. 161 (July 2, 2020), 52 N.J.R. 1474(b) (Aug. 3, 2020) (increasing outdoor gathering limits); Exec. Order No. 163 (July 8, 2020), 52 N.J.R. 1476(a) (Aug. 3, 2020) (requiring individuals to wear masks in outdoor public spaces when they cannot social distance, and permitting some additional indoor and outdoor sports practices); Exec. Order No. 165 (July 13, 2020), 52 N.J.R. 1584(a) (Aug. 17, 2020) (lifting fifty percent capacity limits on NJ Transit and private carriers); Exec. Order No. 168 (July 20, 2020), 52 N.J.R. 1590(a) (Aug. 17, 2020) (permitting resumption of contact practices and competitions for certain organized sports in outdoor settings); Exec. Order No. 175 (Aug. 13, 2020), 52 N.J.R. 1699(a) (Sept. 21, 2020) (permitting reopening of schools for in-person instruction); Exec. Order No. 181 (Aug. 27, 2020), 52 N.J.R. 1712(a) (Sept. 21, 2020) (permitting health clubs and amusement and water parks to open their indoor premises); Exec. Order No. 183

understanding of Covid-19, including the situations and settings where it is most easily transmitted; recommendations made by public health experts, including the CDC; and decreases in the rate of positive Covid-19 tests and hospitalizations in the State.

Most pertinent to the present appeals, on June 3, 2020, the Governor permitted non-essential retail businesses to open to the public, subject to the same limitations applied to essential businesses, and permitted outdoor dining at restaurants and bars, subject to limitations.  Exec. Order No. 150 (June 3, 2020), 52 N.J.R. 1298(a) (July 6, 2020).  Six days later, the Governor formally rescinded the stay-at-home order issued on March 21, 2020.  Exec. Order No. 153 (June 9, 2020), 52 N.J.R. 1303(a) (July 6, 2020).  Earlier, on May 16, 2020, the Governor had clarified in EO 146 that:  "If [a] New Jersey resident leaves their home or place of residence to participate in any activity otherwise authorized by any [EO] issued after March 21, 2020, it shall not be a violation

---

(Sept. 1, 2020), 52 N.J.R. 1714(b) (Sept. 21, 2020) (among other things, permitting restaurants, bars, and entertainment centers to reopen indoor service); Exec. Order No. 187 (Oct. 12, 2020), 52 N.J.R. 2029(a) (Nov. 16, 2020) (allowing resumption of contact practices and competitions for certain organized sports in indoor settings); Exec. Order No. 192 (Oct. 28, 2020), 52 N.J.R. 2079(a) (Dec. 7, 2020) (establishing safety protocols at worksites).

of Paragraph 2 of [EO] No. 107 (2020)." Exec. Order No. 146 (May 16, 2020), 52 N.J.R. 1241(a) (June 15, 2020).

The following week, the Governor permitted personal care service facilities to open, subject to limitations. Exec. Order No. 154 (June 13, 2020), 52 N.J.R. 1355(a) (July 20, 2020). And, on August 27, 2020, he permitted health clubs to reopen their indoor premises, subject to capacity limitations. Exec. Order No. 181 (Aug. 27, 2020), 52 N.J.R. 1712(a) (Sept. 21, 2020).

The re-openings did not all go as smoothly as anticipated. For example, in EO 157, issued on June 26, 2020, the Governor permitted indoor dining, subject to limitations. Exec. Order No. EO 157 (June 26, 2020), 52 N.J.R. 1455(a) (Aug. 3, 2020). However, just three days later, the Governor issued EO 158, rescinding EO 157 to the extent it would have permitted indoor dining, due to spikes of Covid-19 cases around the nation that were attributed to activities in indoor food and beverage establishments. Exec. Order No. 158 (June 29, 2020), 52 N.J.R. 1458(a) (Aug. 3, 2020). Thereafter, the Governor did not reopen indoor dining, subject to capacity and other limitations, until September 1, 2020. Exec. Order No. 183 (Sept. 1, 2020), 52 N.J.R. 1714(b) (Sept. 21, 2020).

In addition, on August 3, 2020, due to a cluster of Covid-19 cases traced to a house party, the Governor limited indoor gatherings to twenty-five percent capacity, but not more than twenty-five persons, with higher in-person limits applicable to religious services or celebrations, political activities, wedding ceremonies, and funerals or memorial services, for which contact tracing would be easier. Exec. Order No. 173 (Aug. 3, 2020), 52 N.J.R. 1636(a) (Sept. 8, 2020).

There was a surge of Covid cases in the fall and winter of 2020/2021, which resulted in the Governor imposing additional restrictions on a temporary basis. For example, on November 10, 2020, the Governor imposed a limitation on the hours when food and beverages could be served indoors, and suspended indoor interstate youth sports competitions, noting outbreaks of Covid-19 cases in such settings. Exec. Order No. 194 (Nov. 10, 2020), 52 N.J.R. 2083(a) (Dec. 7, 2020). Two days later, the Governor permitted counties and municipalities to impose additional restrictions on the hours of operation of non-essential retail businesses, food and beverage establishments, personal care service businesses, and recreation and entertainment businesses. Exec. Order No. 195 (Nov. 12, 2020), 52 N.J.R. 2085(a) (Dec. 7, 2020).

In addition, on November 16, 2020, the Governor lowered indoor and outdoor gathering limits. Exec. Order No. 196 (Nov. 16, 2020), 52 N.J.R. 2086(a) (Dec. 7, 2020). And on November 30, 2020, the Governor temporarily paused indoor practices and competitions for organized, group, and/or competitive sports, between December 5, 2020, and January 2, 2021. Exec. Order No. 204 (Nov. 30, 2020), 52 N.J.R. 2160(a) (Dec. 21, 2020).

Since February 2021, however, the Governor began easing restrictions again, citing expanded access to testing and personal protective equipment, the federal government's emergency use authorization for several Covid-19 vaccines, and the State's vaccination efforts, as well as decreases or stabilizations in the statewide rate of virus transmission and the number of new hospital admissions, current hospitalized patients, ventilators in use, and patients in intensive care.

For example, on February 3, 2021, the Governor raised the indoor capacity limits from twenty-five to thirty-five percent for certain businesses, including food and beverage establishments, entertainment centers, personal care service facilities, health clubs, and casinos, and eliminated the curfew previously applied to indoor dining. Exec. Order No. 219 (Feb. 3, 2021), 53 N.J.R. 288(a) (Mar. 1, 2021). Nine days later, on February 12, 2021, the Governor permitted

23

limited spectators at youth sporting events. Exec. Order No. 220 (Feb. 12, 2021), 53 N.J.R. 395(a) (Mar. 15, 2021).

Ten days later, on February 22, 2021, the Governor increased capacity limits for religious services or celebrations, and for large sports and entertainment venues, and permitted some spectators for collegiate sporting events. Exec. Order No. 225 (Feb. 22, 2021), 53 N.J.R. 571(a) (Apr. 19, 2021). Nine days later, on March 3, 2021, the Governor clarified the capacity limits for wedding receptions: thirty-five percent capacity for indoor receptions, but no more than 150 people, excluding staff; and no more than 150 at an outdoor reception. Exec. Order No. 228 (Mar. 3, 2021), 53 N.J.R. 573(a) (Apr. 19, 2021).

On March 11, 2021, the Governor, among other things, increased indoor gathering limits and increased indoor capacity limits to fifty percent for religious services or celebrations, restaurants and bars, personal care services, health clubs, recreational and entertainment businesses, and casinos. Exec. Order No. 230 (Mar. 11, 2021), 53 N.J.R. 576(a) (Apr. 19, 2021). On March 17, 2021, the Governor issued an order permitting outdoor interstate sports competitions to resume within the State. Exec. Order No. 232 (Mar. 17, 2021), 53 N.J.R. 581(a) (Apr. 19, 2021). And, on March 29, 2021, the Governor increased outdoor

gathering limits and increased capacity for large venues. Exec. Order No. 234 (Mar. 29, 2021), 53 N.J.R. 669(a) (May 3, 2021). Nevertheless, the State continued under a declared public health emergency and state of emergency. Exec. Order No. 231 (Mar. 17, 2021), 53 N.J.R. 579(a) (Apr. 19, 2021); Exec. Order No. 235 (Apr. 15, 2021), 53 N.J.R. 761(a) (May 17, 2021); Exec. Order No. 240 (May 14, 2021), 53 N.J.R. 1041(a) (June 21, 2021).

Although the state of emergency continued, in the spring of 2021, the Governor issued new orders that ramped up the elimination of many remaining restrictions.[9] At the end of May he issued EO 242, which eliminated indoor mask mandates but encouraged unvaccinated individuals to continue to wear masks in public spaces and permitted employers and other entities to establish

---

[9] See Exec. Order No. 237 (Apr. 28, 2021), 53 N.J.R. 967(a) (June 7, 2021) (permitting summer youth overnight and day camps); Exec. Order No. 238 (May 3, 2021), 53 N.J.R. 968(a) (June 7, 2021) (increasing outdoor gathering limits but maintaining a fifty percent capacity limit for certain indoor gatherings and business operations); Exec. Order No. 239 (May 12, 2021), 53 N.J.R. 970(a) (June 7, 2021) (among other things, eliminating capacity limitations for businesses, and outdoor gathering limits, but maintaining a six-foot social distancing requirement and addressing indoor gathering limits, which were superseded in EO 242); Exec. Order No. 241 (May 17, 2021), 53 N.J.R. 1042(a) (June 21, 2021) (eliminating mask requirements for outdoor public spaces, regardless of vaccination status, but permitting employers and other entities to establish their own rules and excepting certain service providers, e.g., childcare centers, schools, youth summer camps, and health care and correctional facilities).

their own policies. <u>Exec. Order No. 242</u> (May 24, 2021), 53 N.J.R. 1044(a) (June 21, 2021). That order also eliminated capacity limitations for businesses; eliminated social distancing mandates in public spaces, businesses, and outdoor gatherings; and eliminated any numerical limits pertaining to indoor gatherings. <u>Ibid.</u> However, certain premises were excluded from the definition of public spaces (e.g., schools, childcare centers, and youth summer camps), and the EO did not supersede masking and social distancing requirements in, e.g., health care facilities, corrections facilities, and public transportation. <u>Ibid.</u> The EO also permitted municipalities to impose additional restrictions. <u>Ibid.</u>

In EO 243, effective June 4, 2021, the Governor rescinded portions of EO 107 that directed employers to accommodate telework and work from home arrangements. The Governor also clarified mask-wearing rules in workplaces that are not open to the public. <u>Exec. Order No. 243</u> (May 26, 2021), 53 N.J.R. 1047(a) (June 21, 2021).

On June 1, the Legislature passed <u>A. 5820</u> (2021) that affirmed the Governor's authority to take action as he had under the Disaster Control Act, and directed that "[a]ll [EOs] issued by the Governor prior to the effective date of this act that relied on the existence of the public health emergency declared by the Governor in [EO] No. 103 of 2020, as extended, shall expire 30 days

26

following the effective date of this act, [July 4, 2021]" except for thirteen specific EOs that would remain in effect through January 2022.[10]  (Citation omitted).  Three days later, the Governor signed the bill into law, see L. 2021, c. 103, and issued EO 244 that declared an end to public health emergency under the EHPA but continued the state of emergency under the Disaster Control Act. Exec. Order No. 244 (June 4, 2021), ___ N.J.R. ___ (____).

## II.

With this history in mind, we turn to the issues before us.  Central to all of the contentions on appeal are the provisions of the EHPA and the Disaster Control Act, which were both relied upon by the Governor in issuing his EOs. The EHPA authorizes the Governor to declare a public health emergency and to renew that declaration every thirty days.  N.J.S.A. 26:13-3.  It defines a "[p]ublic health emergency" as:

> an occurrence or imminent threat of an occurrence that:
>
> a.    is caused or is reasonably believed to be caused by any of the following:  (1) bioterrorism or an accidental release of one or more biological agents; (2) the appearance of a novel or previously controlled or eradicated biological agent; (3) a natural disaster; (4) a chemical attack or accidental release of toxic chemicals; or (5) a nuclear attack or nuclear accident; and

---

[10]  EO Nos. 106, 111, 112, 123, 127, 150, 159, 170, 178, 207, 229, 233, 237.

> b. poses a high probability of any of the following harms: (1) a large number of deaths, illness, or injury in the affected population; (2) a large number of serious or long-term impairments in the affected population; or (3) exposure to a biological agent or chemical that poses a significant risk of substantial future harm to a large number of people in the affected population.
>
> [N.J.S.A. 26:13-2.]

The Disaster Control Act authorizes the Governor to declare an emergency and take action to protect the health, safety, and welfare of the people of the State in the context of an emergency. N.J.S.A. App. A:9-33, 9-34, 9-45, 9-51; Worthington v. Fauver, 88 N.J. 183, 193-94 (1982). It defines an "emergency" as including a "disaster" or "war emergency," with "disaster" defined as

> any unusual incident resulting from natural or unnatural causes which endangers the health, safety or resources of the residents of one or more municipalities of the State, and which is or may become too large in scope or unusual in type to be handled in its entirety by regular municipal operating services.
>
> [N.J.S.A. App. A:9-33.1(1), (4).]

In a case decided under the Disaster Control Act, the Supreme Court has stated that "[t]he determination of whether an 'emergency' exists requires a fact-specific analysis," and "[t]here is no temporal rule of thumb for determining when an 'emergency' ceases to exist." Cnty. of Gloucester v. State, 132 N.J.

141, 150 (1993) (invalidating EO that had been renewed for almost twelve years). "Rather, courts should consider the passage of time and other factors such as the extent to which the problem is within the government's control, and the extent to which remedial efforts have been undertaken." Id. at 150-51 (citations omitted).

The court should not merely substitute its judgment for that of the Governor. The Legislature has delegated the authority to the Executive Branch, which possesses the necessary expertise. Therefore, the Judiciary's review of the Governor's decision is extremely deferential.

"[T]he Governor's power under the Disaster Control Act must be liberally construed to accomplish its crucial legislative purpose." Worthington, 88 N.J. at 199. We review orders issued under the Disaster Control Act for whether they "bear[] a rational relationship to the [legislative] goal of protecting the public," and are "closely tailored to the scope of the current emergency situation," or are arbitrary and capricious. Id. at 197-98, 202-05.

The same standard applies when reviewing EOs issued under the EHPA, since they are also issued by the Governor pursuant to authority granted by the Legislature. Id. at 208. "An [EO] is invalid if it usurps legislative authority by acting contrary to the express or implied will of the Legislature." Commc'ns

Workers of Am., AFL-CIO v. Christie, 413 N.J. Super. 229, 259 (App. Div. 2010). However, "when the Governor is acting consistently with express or implied authority from the Legislature, his or her action should be given 'the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it.'" Id. at 259-60 (quoting Bullet Hole, Inc. v. Dunbar, 335 N.J. Super. 562, 575 (App. Div. 2000)). "Conversely, '[e]mergency' executive power can be an unconstitutional usurpation of legislative authority either when the executive acts contrary to the expressed or implied will of the Legislature or when the Legislature has failed to act." Perth Amboy Bd. of Educ. v. Christie, 413 N.J. Super. 590, 601 (App. Div. 2010) (alteration in original) (quoting Worthington, 88 N.J. at 207).

> In determining whether the Governor's executive order violates the separation of powers doctrine, we must consider whether the order represents a usurpation of legislative power by the executive branch. . . . When discerning the Legislature's intent, courts consider not only the particular statute in question, but also the entire legislative scheme of which it is a part. Sources of legislative intent are the language of a statute, the policy behind a statute, concepts of reasonableness and legislative history.
>
> [Id. at 602 (alterations, internal quotation marks and citations omitted).]

III.

In their first argument before us, the Bayshore appellants contend that the Covid-19 EOs are invalid and unenforceable because the Governor did not comply with the procedures set forth in the EHPA for declaring a public health emergency by failing to consult with the Commissioner and the OEM Director, as set forth in N.J.S.A. 26:13-3(a). Although this contention, if true, might have undermined the Governor's actions, it is no longer a viable issue because the public health emergency is now over and the Legislature, through its enactment of its recent legislation, ratified the Governor's earlier EOs. For that reason, a decision from us will not impact any actions taken by the Governor to date or going forward, absent his attempt to declare another public health emergency and issue new EOs. The issue is therefore moot as it is not "likely to reoccur [and be] capable of evading review." Zirger v. Gen. Accident Ins., 144 N.J. 327, 330 (1996). Accord Nini v. Mercer Cnty. Cmty. Coll., 202 N.J. 98, 117 (2010); Wisniewski v. Murphy, 454 N.J. Super. 508, 518 (App. Div. 2018).

We reach a similar conclusion as to Point II of the Bayshore appellants' brief in which they contend the stay-at-home directive found in EO 107 did not comply with the EHPA's procedures for quarantining and isolating individuals, N.J.S.A. 26:13-5. As already noted, in June 2020 the Governor formally

31

rescinded this provision of EO 107. For that reason, a decision from us as to the order's legality or enforceability of the provision can have no practical effect. Redd v. Bowman, 223 N.J. 87, 104 (2015); Wisniewski, 454 N.J. Super. at 518; Deutsche Bank Nat'l Tr. Co. v. Mitchell, 422 N.J. Super. 214, 221-22 (App. Div. 2011). Because it is moot, we will not address the issue. Nini, 202 N.J. at 117. See, e.g., Spell v. Edwards, 962 F.3d 175, 177, 178-79 (5th Cir. 2020) (rejecting challenge to expired stay-at-home order as moot); World Gym, Inc. v. Baker, 474 F.Supp.3d 426, 430-31 (D. Mass. 2020) (rejecting as moot challenge to Covid-19 related restrictions since restrictions had been lifted).

In Point III, the Bayshore appellants argue that the Governor's Covid-19 EOs are no longer enforceable because the Governor cannot demonstrate the presence of a public health emergency as defined by the EHPA. Similarly, in their Point IV, they also argue that without an emergency the Governor does not have the authority to issue ongoing Covid-19 EOs under the Disaster Control Act. Here again, in light of the Legislature's actions and the rescinding of the declaration of a public health emergency, we have no cause to render a decision in response to these contentions in support of a claim for injunctive relief.

Next, we consider the two points raised by the RSC appellants. In their Point I, the RSC appellants contend the Governor's executive action to shutter

businesses and restrict commerce during the Covid-19 pandemic violates their right to equal protection under the New Jersey Constitution. In particular, they contend the distinction between essential and non-essential businesses violates their equal protection right, as did the differential treatment of retail establishments, restaurants, and entertainment businesses versus gyms, movie theaters, and amusement parks. They argue the categories are arbitrary and do not rationally relate to the goal of protecting the health, safety, and welfare of New Jersey residents.

Although the challenged distinction between essential and non-essential businesses was established on March 21, 2020, in EO 107, it was abandoned on June 3, 2020. Exec. Order No. 150 (June 3, 2020), 52 N.J.R. 1298(a) (July 6, 2020). Therefore, the RSC appellants' equal protection and substantive due process arguments are moot to the extent they relate to the distinction between essential and non-essential businesses. Redd, 223 N.J. at 104; Wisniewski, 454 N.J. Super. at 518; Deutsche Bank, 422 N.J. Super. at 221-22; City of Camden v. Whitman, 325 N.J. Super. 236, 243 (App. Div. 1999).

In their Point II, the RSC appellants contend the Covid-19 orders violate their right to substantive due process under the New Jersey Constitution. More specifically, they contend "the rights to business and employment opportunity

are liberty interests protected by our Constitution," and the essential versus non-essential "classifications set forth in [EO] 107 bear no relation whatsoever to the goal of protecting public safety, because the Order classifies businesses without regard to their ability to safely service the public."

Here too the challenged restrictions are no longer in effect. None of the RSC appellants are subject to any restrictions. We have no cause to review the rescinded EOs.

We are not persuaded otherwise by the RSC appellants' reliance on the so called "voluntary cessation doctrine," and we find inapposite their citation to Galloway Twp. Bd. of Educ. v. Galloway Twp. Educ. Assoc., 78 N.J. 25, 42 (1978). In that case, the Court addressed "whether an unfair practice proceeding premised upon an alleged refusal to negotiate in good faith in violation of N.J.S.A. 34:13A-5.4(a)(5) is mooted by the subsequent consummation of a collective agreement between the charging party and the party whose alleged unlawful conduct was the basis of the unfair practice charge." Id. at 37. In resolving the issue, the Court relied upon the subject statute "specifically empower[ing]" the Public Employment Relations Commission (PERC) to determine not only whether a party charged with an unfair practice "is engaging in any such unfair practice," but also whether the party "has engaged" in the

unfair practice. Id. at 39. In concluding the dispute was not moot based on the statute's language, the Court did not establish a general rule that PERC must adjudicate unfair labor practices where the offending had ceased. Rather, mootness was left to PERC's determination on the basis of the facts of each particular case.

In the present case, the enactment of L. 2021, c. 103 did not preserve claims based on the Governor's Covid-19 EOs. To the contrary, the Legislature gave those orders its imprimatur and, in doing so, vitiated appellants' contentions as argued in these appeals.

Also distinguished from the present facts are those in the other case cited by the RSC appellants, Roman Cath. Diocese of Brooklyn v. Cuomo, 141 S. Ct. 63 (2020). There, the facts did not include any action by the New York Legislature related to the New York governor's EOs that imposed "very severe restrictions" on religious gatherings, which the United States Supreme Court viewed as "especially harsh treatment" directed at "houses of worship." Id. at 65-66. The cessation of the restrictions was the result of an amended EO that kept the door open for unilateral action by the New York governor to restore the limitations, without any Legislative action. In the present case, we are at a point where the Legislature and Governor have determined that such restrictions,

whether by statute or EO, are no longer necessary. There is no ongoing public health emergency leaving the litigants exposed to disparate treatment as the Supreme Court found in Cuomo. The Cuomo Court's holding in support of its granting a stay of the subject EO has no bearing on the case before us.

IV.

In sum, because the appellants in these appeals sought injunctive relief to essentially undo the Governor's earlier actions based on his reliance on a public health emergency under the EPHA without authorization from the Legislature, and in light of the enactment of L. 2021, c. 103 that granted the Governor express and implied authority to issue the challenged EOs that remain in effect and those that may be issued in the future, as well as the Governor's rescinding of the public health emergency, all of the contentions on appeal are moot, and the circumstances therefore warrant the dismissal of the appeal. See In re Plan for the Abolition of the Council on Affordable Hous., 214 N.J. 444, 451 n.1 (2013) (acknowledging our dismissal of an appeal where the then-governor issued an EO rescinding an earlier one that was the subject of the parties' dispute).

Appeal dismissed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3616-19